IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-00884-MEH

CARL NELSON NILGES,

      Plaintiff,

v.

AARON GILMOUR, in his individual and official capacities,
DAVID KELSO, Deputy, in his individual and official capacities,
GEOFFREY MAISCH, in his individual and official capacities, and
DALE PEMBERTON, in his individual and official capacities,

      Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff, who suffers from several physical impairments including cerebral palsy, alleges that on April 19, 2014, while detained at the Arapahoe County Detention Facility, he was placed in a holding cell in the medical unit and, as he attempted to approach the door (apparently left slightly open by the deputies, including the Defendants, who had just departed), the Defendants re-entered the cell, pushed Plaintiff against the back wall, and one Defendant twisted Plaintiff's arm so that he fell causing physical injuries, including that the femur in Plaintiff's right leg broke at mid-shaft. Based on these (and other) allegations, Plaintiff brings claims against the Defendants under 42 U.S.C. § 1983 for excessive force and for failure to prevent excessive force in violation of the Fourteenth Amendment (governing constitutional claims by a pretrial detainee).

      Defendants deny these allegations and, here, seek summary judgment in two separate motions. First, Defendant Geoffrey Maisch ("Maisch") seeks summary judgment asserting qualified immunity and arguing that just prior to the incident in question, Plaintiff had assaulted three deputies

and, thus, the Court must follow Tenth Circuit precedent regarding the proper use of force on an assaultive inmate. Second, Defendants David Kelso, Aaron Gilmour, and Dale Pemberton ("Defendants") assert they are also entitled to qualified immunity and argue the Plaintiff fails to demonstrate genuine issues of material fact as to whether (1) the Defendants personally participated in the alleged claims; (2) the allegations establish an excessive force claim; and (3) there was sufficient time for Defendants to intervene and prevent any excessive force.

The Court finds the Plaintiff fails to demonstrate genuine issues of material fact as to whether the conduct in question constituted constitutionally excessive force and whether his right against the alleged conduct was clearly established. Accordingly, the Court will grant the Defendants' motions.

## **FINDINGS OF FACT**

The Court makes the following findings of fact viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.[1]

1.      Plaintiff was arrested on the evening of March 28, 2014 for harassment, violation of a protection order, and resisting arrest, and he was booked into the Arapahoe County Detention Facility ("ACDF") early in the morning of March 29, 2014.

2.      On April 19, 2014, Plaintiff was detained in Pod 5E of the ACDF, which is a minimum security, direct supervision pod in which there are no doors on the cells and inmates are free to enter the dayroom or use the restrooms, unless placed on a "lockdown" (or, order for inmate to remain in his cell).

3.      Given the greater freedom afforded inmates housed in Pod 5E, inmates are required to abide by the rules. If an inmate receives more than four disciplinary write-ups in a month in a direct supervision pod, the inmate will be moved to a more restrictive housing unit.

---

[1]Unless cited, these facts are undisputed by the parties.

4.      Sometime during the evening medication pass on April 19, 2014, Plaintiff became upset with the nurse who was distributing medications in Pod 5E and began yelling at her. Plaintiff was warned to stop and when he did not, he was ordered on lockdown and to return to his cell.

5.      Plaintiff walks with a pronounced limp and unsteady gait.

6.      Plaintiff returned to his cell, but came back out in violation of the lockdown order to go to the kiosk to file a kite. Plaintiff continued to leave his cell and yell at the nurse and at Deputy Yantiss, who was required to stand with the nurse during the medication pass.

7.      After completing the medication pass, Yantiss returned to his workstation and began writing up the Plaintiff for violating the lockdown order. As he started the disciplinary write-up, Yantiss discovered that Plaintiff had more than four disciplinary write-ups that month; thus, Yantiss contacted his supervisor, Defendant Maisch, to determine where he could move Plaintiff.

8.      Maisch conferred with classifications personnel and his direct supervisor, Defendant Sgt. Kelso ("Kelso"), the acting watch commander for that shift, regarding moving Plaintiff to the medical unit, where Plaintiff could be housed in a cell with a door, but would still have access to an ADA compliant shower. Kelso authorized the move.

9.      Maisch knew Plaintiff "had a problem with his right arm" and "had a disability." Deposition of Geoffrey Maisch, September 12, 2017 ("Maisch Dep.") 69: 2–25.

10.     Maisch and Yantiss went to Plaintiff's cell and asked him to pack up his items because he was being moved to the medical unit. Plaintiff refused to pack his items, argued with the deputies, and refused to walk voluntarily to the medical unit.

11.     Maisch did not use force or place Plaintiff in handcuffs in Pod 5E or while in transit to Medical Cell 7 ("MC7").

12.     At some point, Deputy Lombardi, having observed the disturbance, entered the dayroom to

assist Maisch and Yantiss.

13.     As a result of Plaintiff's refusal to comply, Maisch and Lombardi grabbed Plaintiff's arms and began escorting him to the medical unit.

14.     While being escorted to MC7, Plaintiff actively resisted, including pulling his arm out of Lombardi's grasp and elbowing Lombardi.

15.     Plaintiff was temporarily placed in MC7, which was vacant, while it could be determined where he was going to be permanently housed.  The deputies placed a plastic chair in the cell so that Plaintiff could sit while they discussed where to house him.

16.     Once in MC7, Plaintiff refused to sit and began throwing punches at the deputies, including striking Deputy Teresa Dillard ("Dillard") on the arm.

17.     Plaintiff also punched Maisch in the chest with a closed fist, striking Maisch's bulletproof vest and trauma plate.  Maisch noticed that Plaintiff had used his left arm to punch him (Plaintiff's non-disabled arm), and was surprised by how hard Plaintiff could swing.  Maisch laughed and told Plaintiff, "That was the dumbest thing you've ever done."

18.     Despite being punched, Maisch took no immediate physical action against Plaintiff and, instead, instructed Plaintiff to sit back down.

19.     Because Plaintiff had already assaulted three deputies, Maisch made the decision to utilize a takedown maneuver, which placed Plaintiff on the ground so he could be handcuffed.

20.     Given Plaintiff's conduct, it was determined that he would be placed in a padded, holding cell in the booking unit, holding cell 3 ("HC3").  HC3 is used to temporarily house assaultive inmates while they cool down.  Plaintiff was escorted to and placed in HC3.

21.     Once inside HC3, Plaintiff was instructed to get on his knees, but because of his disability, Plaintiff told the deputies that he could not kneel.  As a result, Plaintiff was allowed to remain

standing while his handcuffs were removed.

22.    Plaintiff was placed against a wall in a corner away from the cell door and his handcuffs were removed.

23.    The deputies then begin to exit the cell one by one.  As Maisch, the last deputy to leave the cell, was stepping backward toward the door, Plaintiff stepped away from the wall and began moving toward Maisch, despite Maisch's repeated orders that Plaintiff step back and stand against the wall.

24.    Maisch utilized two open-palmed shoves in an attempt to push Plaintiff toward the back of the cell.

25.    Plaintiff kept advancing on Maisch despite the verbal and physical warnings.

26.    As the cell door was shutting, Plaintiff advanced again, thrusting his left arm through the doorway.

27.    Plaintiff struck Maisch, who was at or just outside the threshold of the door, in the chest.

28.    It was Plaintiff's intention to prevent the deputies from shutting the cell door until they answered his questions about when he would return to Pod 5E.  Defendants' Reply 6–7.

29.    Defendant Kelso observed Plaintiff's arm come through the doorway, ordered the door to be opened, and placed his hand on the cell door to stop it from being shut.

30.    The cell door had a long, narrow (rectangular) window on the side near the door knob. Video of Incident in HC3 ("Video") 10:06:14–10:06:19, ECF 173.[2]

31.    Kelso knew that Plaintiff had an "obvious malady" in which Plaintiff "appeared to have a clubbed hand on his right side and walked with a limp."  Deposition of David Kelso, September 15,

_____

[2]Notably, the record demonstrates no authentication of the Video (which depicts action without sound); however, because all parties rely on the Video for their positions on summary judgment, the Court will reasonably assume the Video is authentic and, thus, admissible pursuant to Fed. R. Civ. P. 56(c)(2).

2017 ("Kelso Dep.") 77: 3–16.

32.     The cell door, which was half-closed before Plaintiff thrust his arm through it, was then swung wide open. Video 10:06:18–10:06:21. Plaintiff stood just inside the threshold facing the deputies on the other side of the door and shifting on his feet. *Id.*

33.     Maisch did not open the cell door prior to re-entering the cell.

34.     Once the door was open, Maisch entered the cell, advanced on Plaintiff, grabbed his wrist, and started to turn Plaintiff back toward the far wall of the cell, intending to perform an "arm bar" takedown.

35.     The "arm bar" was a standard FBI takedown maneuver that Maisch had utilized throughout his career with the intent to inflict pain.

36.     As Maisch entered the cell, several deputies entered directly behind him, including Kelso whose hand was on Maisch's shoulder. Video 10:06:17–10:06:21. Maisch testified he felt "a force pushing [him] forward" into the cell. Maisch Dep. 189: 5–10; 190: 13–21.

37.     For purposes of this motion only, Maisch accepts "that the momentum of the takedown may have caused [Plaintiff's] fall." Maisch Mot. 4 n.3.

38.     Before Plaintiff fell to the ground, his head hit the back wall. Video 10:06:21–10:06:24.

39.     Plaintiff testified that he heard his femur break when he landed on the ground and was rolling onto his side. Nilges Dep. 596:18 – 597:10.

40.     Plaintiff has had multiple surgeries to his femurs, including the femur that was injured in this incident.

41.     Prior to the takedown, Maisch did not know what problems Plaintiff had with his right femur and did not know that Plaintiff had prior surgeries on that femur.

42.     Defendants Deputy Pemberton and Deputy Gilmour followed Kelso and Maisch into the cell

and each restrained Plaintiff's legs by placing a hand on each leg to prevent Plaintiff from kicking. Pemberton had previously observed that Plaintiff "clearly had some medical, physical problems." Deposition of Dale Pemberton, September 14, 2017 ("Pemberton Dep.") 78: 7–13.

43.     Plaintiff was already on the ground when Pemberton and Gilmour placed their hands on Plaintiff's legs. Neither deputy used any force at that point because Plaintiff was neither kicking nor physically resisting restraint.

44.     Once Plaintiff was secured, all deputies exited the cell.

45.     Kelso then ordered the booking deputies to have the nurse examine the Plaintiff.

46.     Plaintiff was charged with two counts of Assault in the Second Degree, a Class 4 Felony, for his assaults against Maisch and Dillard, and he did not challenge that probable cause existed for either felony offense. These assaults occurred prior to and outside of the incident in HC3.

47.     Plaintiff ultimately pled guilty to one count of Assault in the Third Degree, a Class One Misdemeanor classified as an extraordinary risk crime under Colorado law.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the

nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

As set forth above, the two motions at issue here were filed by Maisch and by the Defendants (Gilmour, Pemberton, and Kelso).  Mindful of the applicable legal standards, the Court will address each motion in turn.

## I.     Maisch's Motion for Summary Judgment

Maisch asks this Court to grant summary judgment in his favor by following "Tenth Circuit precedent," which holds that "the proper use of force for an assaultive suspect or inmate [includes] that law enforcement officers may employ a takedown maneuver to stop and/or prevent an assault." Mot. 1.  Maisch raises the defense of qualified immunity and argues that Plaintiff fails to demonstrate genuine issues of fact as to whether Plaintiff states a Fourteenth Amendment claim and whether his right against excessive force was clearly established at the time of the incident in HC3.

Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "It is an entitlement not to stand trial or face the other burdens of litigation." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted).  "The privilege is an immunity from suit rather than a mere defense to liability." *Id.*

"Once an individual defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Knopf v. Williams*, -- F.3d --, 2018 WL 1178346, *3 (10th Cir. Mar. 5, 2018) (quoting *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016)).  "This is a heavy burden. If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Id.* (quoting *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017)).

"A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *Id.* (quoting *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017)). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 551 (2017) (quotation omitted)). Although there need not be a "case directly on point," *id.*, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it . . . .'" *Id.* (quoting *City & Cty. of San Francisco v. Sheehan*, -- U.S. --, 135 S. Ct. 1765, 1774 (2015) (quotation omitted)).

"Courts must not define 'clearly established law at a high level of generality.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* (quoting *White*, 137 S. Ct. at 552 (quotation omitted)). "The dispositive question is whether the violative nature of particular conduct is clearly established." *Id.* (quoting *Mullenix v. Luna*, -- U.S. --, 136 S. Ct. 305, 308 (2015)). "Otherwise, 'plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *White*, 137 S. Ct. at 552).

Under these standards, recently clarified by the Supreme Court in *White*, 137 S. Ct. at 552, the Court concludes that Plaintiff fails to demonstrate genuine issues of material fact as to the second prong of a qualified immunity analysis. Though Plaintiff need not cite "a case directly on point," he must show the law "would have been clear to a reasonable officer [in Maisch's position] that his conduct was unlawful in the situation." *Knopf*, 2018 WL 1178346 at *8 (quoting *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011) and *Henderson v. Glanz*, 813 F.3d 938, 953 (10th Cir.

2015)).

Plaintiff cites *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) and *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012) for his argument that "on the strength of these cases [ ] there has been a fair and clear warning to officers and [ ] it is clearly established that [it] is unreasonable to use force where there is no immediate threat to the officer and the plaintiff is not actively resisting and has taken steps to deescalate the situation, including putting space between the plaintiff and the officer." Resp.18. In *Hope*, the Supreme Court determined that "the salient question [in determining whether a right is clearly established] is whether the state of the law in [2014] gave [Maisch] fair warning that [his] alleged treatment of [Plaintiff] was unconstitutional." 536 U.S. at 741.

*Morris*, the other case on which Plaintiff relies, was issued in 2012 and addressed a "forceful takedown" of the plaintiff's (now-deceased) husband who "posed no threat" to the police and did not "resist or flee." 672 F.3d at 1198. Morris' husband had arrived at the scene of a domestic dispute, asked one of the individuals there a "provocative" question, and, when the individual advanced toward him, the husband backed away with his hands up toward police officers standing behind him, including the defendant, who then forcefully took the husband to the ground. *Id.*

In light of *Hope* and *Morris*, the Court finds the law was clearly established in 2014 that an officer engaged in excessive force in violation of the Fourth (or, in this case, the Fourteenth) Amendment by forcefully taking down a non-violent person who was perceived to be, at most, a misdemeanant, who posed no threat to the officer, and who was neither resisting nor attempting to flee. *See id.*; *see also Estate of Booker v. Gomez*, 745 F.3d 405, 428–29 (10th Cir. 2014) (issued before the incident in this case and finding Fourth Amendment cases sufficient to demonstrate clearly established law for a Fourteenth Amendment excessive force claim).

Plaintiff argues that, like Morris' husband, "he had taken clear steps to deescalate by moving

away from the door, and he clearly posed no immediate threat given that act as well as his own limited mobility." Resp. 17. The Court is not convinced. The evidence is undisputed that from 9:58 p.m. to 10:06 p.m. (as depicted in the Video) on April 19, 2014:

- While being escorted to MC7, Plaintiff actively resisted, including pulling his arm out of Deputy Lombardi's grasp and elbowing Lombardi.

- Once in MC7, Plaintiff refused to sit and began throwing punches at the deputies, including striking Deputy Dillard on the arm.

- Plaintiff also punched Maisch in the chest with a closed fist, striking Maisch's bulletproof vest and trauma plate. Maisch noticed that Plaintiff had used his left arm to punch him (Plaintiff's non-disabled arm), and was surprised by how hard Plaintiff could swing. Maisch laughed and told Plaintiff, "That was the dumbest thing you've ever done."

- Given Plaintiff's conduct, he was escorted to and placed in HC3.

- Plaintiff was placed against a wall in a corner away from the cell door and his handcuffs were removed.

- As Maisch, the last deputy to leave the cell, was stepping backward toward the door, Plaintiff stepped away from the wall and began moving toward Maisch, despite Maisch's repeated orders that Plaintiff step back and stand against the wall.

- Maisch utilized two open-palmed shoves in an attempt to push Plaintiff toward the back of the cell.

- Plaintiff kept advancing on Maisch despite the verbal and physical warnings.

- As the cell door was shutting, Plaintiff advanced again, thrusting his left arm through the doorway.

- Plaintiff struck Maisch, who was at or just outside the threshold of the door, in the chest.

- The cell door, which was half-closed before Plaintiff thrust his arm through it, was then swung wide open.

- Maisch did not open the cell door.

- Plaintiff was located inside the threshold facing the deputies on the other side of the threshold.

The undisputed facts of this case demonstrate their considerable distinction from the facts

in *Morris*. Plaintiff was not a person who "posed no threat" to the deputies and who did not "resist"; despite his physical impairments, Plaintiff demonstrated his ability to "punch" and "elbow" the deputies with his non-disabled left arm, as well as to disobey instructions by walking toward the deputies in HC3 despite orders to stay back.

Plaintiff argues that he started to "back away" after he thrust his arm through the open cell door and simply stood there and, thus, posed no immediate threat to Maisch or the other deputies. Resp. 12, 14. However, after review of the Video in this case, on which both parties rely, the Court finds that no reasonable juror could conclude (even viewing the Video in the light most favorable to the Plaintiff) that Plaintiff "retreated" or "backed away" from the cell door with the intent to "back down" or de-escalate the situation. Rather, the Video makes clear that, just after Maisch gave Plaintiff a second shove to keep him away from the door, Plaintiff lunged forward on his left leg and stepped into the threshold while thrusting his arm through the door and striking Maisch. Video 10:06:14–10:06:15. Plaintiff then stepped back from the lunge and shifted on his feet, before stepping forward on his left leg again toward the door as it was being opened. *Id.* 10:06:16–10:06:18. On seeing the deputies advance back into the cell, Plaintiff stepped back at the same time that Maisch entered and grabbed his wrist and elbow. *Id.* 10:06:19–10:06:20.

Plaintiff also contends that he was not "actively resisting" at the moment before Maisch re-entered the cell and grabbed his left arm and, thus, any cases Maisch propounds involving "active resistance" are not applicable here. Plaintiff asserts that "the four[-]second gap between Mr. Nilges' reach through and Sgt. Maisch's re-entry" demonstrates a "lengthy" time during which he simply stood at the doorway. Resp. 14. The Court disagrees. Again, the Video shows Plaintiff lunging through the door with his left arm (10:06:15), then stepping back from the lunge (10:06:16) and stepping toward the entry again (10:06:18) while the door was swinging open. Maisch re-entered

the cell (10:06:19) and grabbed Plaintiff's arm (10:06:20) before taking him down. Plaintiff's second step toward the door just before Maisch grabbed him demonstrates Plaintiff's continued resistance to the deputies' instructions to stay back. Plaintiff has cited, and the Court has found, no case holding that "active resistance" must include something more than an individual stepping toward an officer, who had repeatedly warned the individual to stay back and who the individual had just struck.

Further, the Plaintiff questions the reasonableness of Maisch's use of force and suggests that his conduct "possibly constitutes 'punishment' within the meaning of *Kingsley*." Resp. 15–16, 17 (citing *Kingsley v. Hendrickson*, -- U.S. --, 135 S. Ct. 2466, 2473 (2015)). In *Kingsley*, the Supreme Court addressed whether a pretrial detainee suffered excessive force when correctional officers used a Taser against the detainee while he was lying face down on a bunk in his cell with one officer's knee on his back and with his hands restrained behind him in handcuffs. *Id.* at 2470. The Court prefaced its analysis of qualified immunity with the following pertinent instruction:

> A court (judge or jury) cannot apply this standard mechanically. *See* [*County of Sacramento v.*] *Lewis*, 523 U.S. 833,] 850 [(1998)]. Rather, objective reasonableness turns on the "facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed.2d 443 (1989). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *See ibid*. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

*Id.* at 2473. With respect to "punishment," *Kingsley* states that "such punishment can consist of actions taken with an expressed intent to punish" and "in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in

relation to that purpose." *Id.* (citation and internal quotation marks omitted).

Plaintiff contends that the following "facts" are sufficient to demonstrate a reasonable juror could find Maisch intended to punish Plaintiff by using the arm bar maneuver, rather than for a legitimate, penological purpose: "[Maisch] laughed off Mr. Nilges assault on him in MC7, telling him that it was the stupidest thing he'd ever done; he was aware of Mr. Nilges' physical limitations; Mr. Nilges posed little risk to himself, the officers, or the security of the jail itself after he was placed in HC3; and there was opportunity to end the encounter by simply closing the door." Resp. 18. While it is undisputed that Maisch was aware of Plaintiff's physical impairment and laughed after Plaintiff struck him the first time telling Plaintiff it was the "dumbest thing he'd ever done," the Court disagrees that a reasonable juror could find, following review of the Video, Plaintiff "posed little risk to . . . the officers . . . after he was placed in HC3" for the reasons stated herein. *See* 13–14.

Moreover, Plaintiff cannot show that Maisch himself had the "opportunity to end the encounter by simply closing the door," because it is undisputed that Maisch did not stop the door from closing nor open the door after Plaintiff thrust his arm through. In addition, the undisputed evidence shows that Maisch used little to no force only minutes earlier when Plaintiff first disobeyed the lockdown order, disobeyed the order to pack his items, then resisted and elbowed Deputy Lombardi during transfer to MC7. The undisputed evidence further shows that in MC7, Maisch used a takedown on Plaintiff after he began "punching" deputies, including Maisch and Dillard, but Plaintiff makes no mention of that force here. Mindful of *Kingsley*'s instruction to review the matter from the perspective of a reasonable officer on scene and to account for Arapahoe County's legitimate interests in preserving internal order and discipline and maintaining institutional security, the Court finds Plaintiff fails to demonstrate material factual issues demonstrating Maisch intended

to punish the Plaintiff, rather than to subdue the Plaintiff, who was actively resisting confinement in HC3, based on Maisch's knowledge that Plaintiff was physically impaired and on Maisch's scoffing comment after Plaintiff struck him. *See Kingsley*, 135 S. Ct. at 2473; *see also al-Kidd*, 563 U.S. at 743 (confirming that qualified immunity, when "properly applied, [ ] protects all but the plainly incompetent or those who knowingly violate the law.") (internal quotes and citation omitted).

Under these circumstances, *Morris* does not provide the "fair and clear warning" necessary for Plaintiff to demonstrate that his Fourteenth Amendment right against excessive force was clearly established in this case. *See Hope*, 536 U.S. at 741. Because it would not have been "beyond debate" to a reasonable official that it would be unconstitutionally excessive to use an arm bar maneuver to subdue an actively resisting detainee who was disobeying orders, had just struck an officer, then stepped toward that officer after repeated warnings to stay back, Maisch is entitled to qualified immunity on the particular facts of this case. *See White*, 137 S. Ct. at 551.

The Court will grant Maisch's motion for summary judgment on the Plaintiff's Fourteenth Amendment claim against Maisch for excessive force.

## II. Defendants' Motion for Summary Judgment

Like Maisch, the remaining "Defendants," in their individual capacities, assert qualified immunity against the Plaintiff's Fourteenth Amendment claims for excessive force and for failure to intervene to stop the excessive force.

### A. Excessive Force Claims

Plaintiff argues that the material facts viewed in the light most favorable to him demonstrate it was objectively unreasonable for the Defendants to re-enter the cell and take him to the ground, and that "a person who is not actively resisting at the time the force is used, has backed away or otherwise shown evidence of de-escalation has a [clearly established] right to be free from the use

of force on display here, where [Plaintiff] was taken to the ground and as a consequence suffered a broken femur, a serious bodily injury."  Resp. 7.

Again, the Court finds Plaintiff has failed to demonstrate genuine issues of material fact as to whether he was "not actively resisting," "had backed away" from the cell door, or "otherwise [had] shown evidence of de-escalation" at the time the Defendants had exited HC3 and Plaintiff thrust his arm through the shutting cell door.  In addition to those undisputed facts listed above, the Court considers the following evidence:

- Kelso observed Plaintiff's arm come through the doorway, ordered the door to be opened, and placed his hand on the cell door to stop it from being shut.

- The cell door, which was half-closed before Plaintiff thrust his arm through it, was then swung wide open.

- Maisch did not open the cell door prior to re-entering the cell.

- As Maisch entered the cell, several deputies entered directly behind him, including Kelso whose hand was on Maisch's shoulder. Maisch testified he felt "a force pushing [him] forward" into the cell.  Maisch Dep. 189: 5–10; 190: 13–21.

- Pemberton and Gilmour followed Kelso and Maisch into the cell and each restrained Plaintiff's legs by placing a hand on each leg to prevent Plaintiff from kicking.

- Plaintiff was already on the ground when Pemberton and Gilmour placed their hands on Plaintiff's legs.  Neither deputy used any force at that point because Plaintiff was neither kicking nor physically resisting restraint.

- Once Plaintiff was secured, all deputies exited the cell.

- Kelso then ordered the booking deputies to have the nurse examine the Plaintiff.

The Court must note, at least for purposes of this motion, the Plaintiff does not dispute that Defendants Pemberton and Gilmour used no force after Plaintiff was on the ground; in addition, there is no evidence that Kelso used force on Plaintiff once he was on the ground.  However, the Court construes Plaintiff's argument as alleging that Kelso, Pemberton and Gilmour were responsible for the "momentum" used to re-enter the cell and take Plaintiff down to the floor.

17

The Video depicts Maisch re-entering the cell first, with Kelso closely behind him and Kelso's hand on Maisch's back and shoulder; Pemberton and Gilmour followed, but neither appear to have a hand or any other part of their bodies touching the deputies in front of them. Video 10:06:21–10:06:22. In fact, during Maisch's deposition, Plaintiff's counsel attempted to persuade Maisch that no deputy other than Kelso was touching Maisch as they re-entered the cell. Maisch Dep. 190: 2 – 191: 5. Under these circumstances, the Court finds that no reasonable juror could find that either Gilmour or Pemberton engaged in any excessive force during the incident in HC3 at issue in this case. *See, e.g., Norton v. City of Marietta, Okla.*, 432 F.3d 1145, 1156 (10th Cir. 2005) (even accepting the plaintiff's allegations that officer came to his cell in response to a plumbing problem and, when plaintiff refused an order to lay on his bed, the officer "grabbed [him] around the neck and went to twisting it and hurting it," such conduct did not rise to the level of a constitutional violation).

With respect to Kelso, the Amended Complaint does not identify him as entering the cell (Am. Compl. ¶¶ 29, 75), but the parties do not dispute that discovery has since identified Kelso as the officer who stopped the door from closing and who followed directly behind Maisch with his hand on Maisch's back/shoulder. The Video depicts that once Plaintiff hit the back (padded) wall and fell to the ground (*id.* 10:06:21–10:06:22), Kelso removed his left hand from Maisch's shoulder and bent over Plaintiff's upper body, then placed his right hand on Plaintiff's shoulder and assisted Maisch in bending Plaintiff at the waist so that Plaintiff was lying on his right side (*id.* 10:06:22–10:06:23). Maisch continued to hold Plaintiff's left arm while Kelso crouched over Plaintiff's upper body for the next sixteen seconds; it is unclear from the Video whether Kelso was touching Plaintiff during that time. *Id.* 10:06:23 – 10:06:39. Kelso then stood up and left the cell. *Id.* 10:06:39 – 10:06:45.

Plaintiff argues that Kelso "pushed [Maisch] from behind, contributing to Sgt. Maisch's momentum and to Mr. Nilges' head striking the back wall of the cell" and he "held open the cell door, allowing Sgt. Maisch to re-enter the cell and apply force to a person who was not resisting at that moment, when the officers' legitimate objective – putting Mr. Nilges in the holding cell – had already been completed and the door could have been closed, ending the encounter." Resp. 8, 16. Plaintiff also cites *Buck v. City of Albuquerque*, 549 F.3d 1269, 1280 (10th Cir. 2008) for the proposition that "[a]n officer can be held to have been personally involved in a use of force if he was on the scene directing that use of force." *Id.* at 12. As with Maisch, Plaintiff cites *White*, *Hope*, and *Morris* to contend that "the Court could find that on the strength of these cases it is clearly established that [it] is unreasonable to use force where there is no immediate threat to the officer and the plaintiff is not actively resisting and has taken steps to de-escalate the situation, including putting space between the plaintiff and the officer." *Id.* at 18.

Even assuming Kelso opened the cell door then pushed Maisch through the door causing the momentum that forced Plaintiff to fall,[3] the Court finds Plaintiff has failed to meet his burden to show he had a clearly established right against such conduct. *See Carabajal*, 847 F.3d at 1208 ("This is a heavy burden. If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity."). The Court has already found that, in light of *Hope* and *Morris* (on which the Plaintiff relies) the law was clearly established in 2014 that an officer engaged in excessive force in violation of the Fourteenth Amendment by forcefully taking down a person who was perceived

---

[3]Under *Kingsley* (*see infra* at 23), the Supreme Court identified six factors to consider when analyzing whether an officer used unconstitutionally excessive force. The Court finds that, with respect to Kelso's alleged conduct of holding open and/or opening the cell door (rather than simply closing it as Plaintiff argues) and allegedly pushing Maisch into the cell potentially causing Plaintiff and Maisch to hit the wall and fall to the floor, material factual issues exist concerning the first (the relationship between the need for the use of force and the amount of force used), third (any effort made by the officer to temper or to limit the amount of force), and fifth (the threat reasonably perceived by the officer) factors. *See Kingsley*, 135 S. Ct. at 2473.

to be, at most, a misdemeanant, who posed no threat to the officer, and who was neither resisting nor attempting to flee. *See also Casey v. City of Fed. Heights*, 509 F.3d 1278 (10th Cir. 2007) (finding it clearly established that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest"). While undisputed that Plaintiff posed no threat to Kelso at the time of the takedown, no reasonable juror could find that Plaintiff was not actively resisting at the time of (and just prior to) the takedown and the undisputed facts reveal that Plaintiff was charged with felony assaults for his conduct in MC7, which occurred minutes prior to the HC3 incident and, as a result of which, would cause Kelso to perceive Plaintiff as more than a "misdemeanant." *See* Declaration of Sgt. David Kelso, October 11, 2017 ("Kelso Decl.") ¶ 6 ("It was reported to me by Deputy Thomas that Nilges had assaulted Sgt. Maisch and Deputy Dillard.").

In *Becker v. Bateman*, 709 F.3d 1019 (10th Cir. 2013), the Tenth Circuit addressed whether the plaintiff met his burden to show his right against the defendant officer's takedown during a traffic stop, which resulted in a traumatic brain injury, was clearly established. *Id.* at 1022–23. The court prefaced its analysis stating that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The court found that "to overcome Officer Bateman's defense of qualified immunity, Becker must demonstrate it was clearly established as of May 14, 2005, that Officer Bateman's use of force was excessive" and concluded that "Becker has not carried this burden" because he failed to distinguish a 2007 Tenth Circuit opinion finding "this circuit had not definitively determined the extent to which an officer may use force in a confrontation with a potentially intoxicated person" and the plaintiff's cited cases did not demonstrate otherwise. *Id.* at 1023.

Although the facts in *Becker* are somewhat dissimilar from those here, particularly in that

there is no evidence the Plaintiff was intoxicated at the time of the takedown, *Becker* illustrates that it is the Plaintiff's burden to come forward with a Tenth Circuit or Supreme Court case (or the weight of authority from other courts) that is "particularized to the facts of the case" and "placed the statutory or constitutional question beyond debate" at or before the time of the incident so that an officer is sufficiently notified that his or her conduct is unconstitutional. *Knopf*, -- F.3d --, 2018 WL 1178346 at *3 (*White*, 137 S. Ct. at 552). Plaintiff's reliance on *Morris* and *Hope* to notify Kelso that his conduct was "unconstitutional" by "grabb[ing] the door [ ] and start[ing] to open it" (Kelso Decl. ¶ 7) and allegedly pushing Maisch into the cell and causing the fall is insufficient for the reasons stated above.

Under these circumstances, the Court finds Plaintiff has failed to demonstrate genuine issues of material fact as to whether Pemberton and Gilmour engaged in excessive force and as to whether his right against Kelso's alleged conduct in opening the cell door and pushing Maisch into the cell in such a way as to cause the momentum that forced Plaintiff to fall was clearly established. *See Hope*, 536 U.S. at 741; *Morris*, 672 F.3d at 1195; *Norton*, 432 F.3d at 1156 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.") (citation omitted). The Defendants are entitled to qualified immunity as to Plaintiff's claims of excessive force.

B.     Failure to Intervene Claims

Plaintiff's second claim against the Defendants alleges they failed to intervene to stop the force used against Plaintiff. "[E]ven if a single deputy's use of force was not excessive, 'a law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983.'" *Estate of Booker*, 745 F.3d at 422 (quoting *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996)); *Casey v. City of Federal Heights*, 509 F.3d 1278,

1283 (10th Cir. 2007) ("[T]here is an affirmative constitutional duty to stop other officers from using unconstitutionally excessive force.").

> To establish a constitutional violation under a "failure to intervene" theory, the [p]laintiff[] must show: (i) the defendant officer was present at the scene; (ii) the defendant officer witnessed another officer applying force; (iii) the application of force was such that any reasonable officer would recognize that the force being used was excessive under the circumstances; and (iv) the defendant officer had a reasonable opportunity to intercede to prevent the further application of excessive force, but failed to do so.

*Martinez v. City & Cty. of Denver*, No. 11-cv-00102-MSK, 2013 WL 5366980, at *5 (D. Colo. Sept. 25, 2013) (citing generally *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996), *Gruenwald v. Maddox*, 274 F. App'x 667, 674 (10th Cir. 2008) (unpublished) (defendant officer must be present at the scene to observe the application of force), and *Randall v. Prince George's Cty.*, 302 F.3d 188, 204 & n.24 (4th Cir. 2002) (defendant officer must "know[ ] that a fellow officer is violating an individual's constitutional rights"; if he "lacks such specific knowledge, he cannot be a participant in the unlawful acts")). "This duty was clearly established law at the time of [Plaintiff's takedown]." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).

The undisputed evidence, including the Video, reveals that the first two elements necessary to establish Plaintiff's failure to intervene claims are met: all three Defendants were present and witnessed Maisch take down the Plaintiff. In addition, Plaintiff argues that the Defendants had a sufficient opportunity to intercede and stop Maisch from taking down the Plaintiff. Resp. 18–19. The Court is not entirely convinced; in an unpublished case, the Tenth Circuit cited various circuit opinions demonstrating that "a matter of seconds" may not permit an officer sufficient opportunity to intercede, while two to five minutes is likely sufficient. *See Savannah v. Collins*, 547 F. App'x 874, 877 (10th Cir. 2013). In this case, the Video shows that the period from Plaintiff's lunge through the cell door to Maisch's takedown of the Plaintiff occurred in eight seconds. Video

10:06:15 – 10:06:23.

Even if Plaintiff were able to demonstrate material factual issues concerning the Defendants' opportunity to intervene, the Court concludes the Plaintiff has not demonstrated such issues regarding the third element: "the application of force was such that any reasonable officer would recognize that the force being used was excessive under the circumstances." In support of his argument that Maisch's conduct constituted excessive force, the Plaintiff cited the factors necessary for consideration of whether force is constitutionally excessive from the Supreme Court's opinion in *Kingsley*: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." 135 S. Ct. at 2473.

First, Plaintiff contends that there was no need for Maisch to use force against Plaintiff and, rather, Maisch should have simply closed the cell door. However, again, it is undisputed that Maisch did not open the door. And, while Plaintiff's contention may be appealing at first, the Court is mindful of the Supreme Court's abrogation that a court must avoid "20/20" hindsight and consider the perspective of the officer at the time of the incident. *Id.* Here, Maisch had, minutes earlier, taken Plaintiff down to the floor by force to handcuff him while in MC7; Plaintiff had already punched or elbowed three deputies; he was disobeying orders to stay back from the cell door; and, he had just struck Maisch in the chest a second time. The Court finds this factor weighs against finding the take down excessive.

Second, it is undisputed for purposes of this motion that Plaintiff's femur broke during the HC3 incident and, thus, he suffered a serious injury. It is also undisputed that Plaintiff had had multiple surgeries on both femurs, and that Maisch was unaware of the problems Plaintiff had with

his right femur and did not know that Plaintiff had prior surgeries on that femur. The Court finds this factor weighs slightly in favor of finding the take down excessive.

Third, Plaintiff argues that Maisch made no effort to temper or limit the amount of force he used. The Court disagrees. Despite repeated warnings to remain against the wall while the deputies exited the cell, Plaintiff advanced on Maisch (the last deputy out) and, once at the cell door's threshold, Maisch pushed Plaintiff back away from the door twice before Plaintiff then lunged through the door and struck Maisch in the chest. The Court considers Maisch's repeated warnings and pushes on the Plaintiff to be efforts to limit the force necessary to compel Plaintiff to comply. This factor weighs against finding the take down excessive.

Fourth, Plaintiff argues that his physical impairment and limited mobility render any "severity" of the problem almost nonexistent. The Court takes Plaintiff's limitations into account and recognizes that Plaintiff certainly would be unable to inflict serious harm on all four of the Defendants at the scene. As set forth above, however, the undisputed evidence shows that Plaintiff was able to "pull away from," "elbow," and "throw punches" at three deputies, and he demonstrated his willingness to repeatedly disobey direct orders in the presence of the Defendants. Mindful of Arapahoe County's "need to manage the facility in which the individual is detained" as necessary "to preserve internal order and discipline and to maintain institutional security" (*Kingsley*, 135 S. Ct. at 2473), the Court finds this factor weighs slightly against finding the take down excessive.

Fifth, the Court finds Maisch reasonably perceived Plaintiff as a possible threat at the time he initiated the take down in HC3. Plaintiff had just advanced on Maisch after the deputies removed Plaintiff's handcuffs, Plaintiff thrust his arm through the door striking Maisch in the chest, and Plaintiff stepped toward the door (and toward Maisch) when the door swung open. This factor weighs against finding the take down excessive.

Finally, as set forth above, the Court has determined the undisputed evidence shows Plaintiff was actively resisting just before the take down and, thus, finds this factor weighs against finding Maisch's conduct excessive. On balance, the factors weigh against finding Maisch used excessive force against Plaintiff in HC3; therefore, the Court concludes a reasonable juror could not find the Defendants would recognize that the force being used was excessive under the circumstances, as necessary to avoid summary judgment on the failure to intervene claim.

In sum, the Court concludes Plaintiff has failed to demonstrate material factual issues showing that the Defendants' conduct constituted excessive force or that he had a clearly established right to be free from the alleged conduct, and that Defendants' failure to intervene to stop Maisch violated his Fourteenth Amendment rights. Finding the Defendants entitled to qualified immunity on the Plaintiff's second claim, the Court will grant the Defendants' motion.

## **CONCLUSION**

The undisputed evidence in this case demonstrates that Plaintiff fails to show genuine issues of material fact as to whether his right to be free of the alleged conduct by all Defendants was clearly established; whether all Defendants used force that was constitutionally excessive; and whether the Defendants' failure to stop Maisch from taking Plaintiff to the ground in HC3 violated his Fourteenth Amendment rights. The Court concludes all Defendants are entitled to qualified immunity in this case.

THEREFORE, based upon the foregoing and the entire record before the Court, the Motion for Summary Judgment filed by Geoffrey Maisch [filed October 30, 2017; ECF No. 131] and Defendants Dale Pemberton, Aaron Gilmour, and David Kelso's Motion for Summary Judgment [filed October 30, 2017; ECF No. 129] are **granted**.

In light of this order, the Defendants' Rule 702 Motion Challenging the Expert Testimony

of Dan Montgomery [filed October 25, 2017; ECF No. 124] and Defendants' Motion for Leave to Amend Answer and Add Affirmative Defense [filed January 30, 2018; ECF No. 164] and Defendants' Motion for Leave to File Supplemental Authority in Support of Defendants' Motions for Summary Judgment [filed March 26, 2018; ECF No. 176] are **denied as moot**.

Due to the pending motions for sanctions filed by the Defendants [ECF Nos. 125, 126], for which the Court is currently scheduled to hear arguments on April 4, 2018, the Court will not enter a Judgment and close the case at this time.

ORDERED this 2nd day of April, 2018, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge